And we'll start with our day calendar. The first case is Citizens for Responsibility versus Trump. Thank you and may it please the court. Just take one second. Okay, go right ahead. Thank you and may it please the court. Deepak Gupta for the Plaintiff's Appellants. The plaintiffs here are hotel and restaurant industry competitors with the defendant's businesses. They have Article 3 standing under the well-established competitor standing doctrine. And that doctrine requires us to plausibly allege two things. First, that the plaintiffs actually compete in the same arena as the defendant's properties. And second, that the defendant's allegedly illegal conduct confers an advantage on his properties, thus placing the plaintiffs at a competitive disadvantage. We have made that showing here, not just... That's part of it, right? That's the injury part. Then you're going to get to traceability and redressability. That's right, Your Honor, but I think traceability and redressability, the reason that in the competitor standing doctrine cases, the analysis is not belabored, is because when you show that the defendant's allegedly illegal conduct confers an advantage on the defendant, economic logic dictates, if the plaintiffs are truly competing in the same arena, that that competitive disadvantage is itself an Article 3 harm, an Article 3 injury, because it has consequential harms that follow. Your argument about the competitive part. But I think you still have to have an issue as to whether or not the... Right. ...is the but-for causation of the competitive injury, that without the violation, there would be no problem. In other words, you would not have a competitive disadvantage. And that goes to the motives of why people patronize the Trump establishments, right? Yes, Your Honor, to some degree. And I think it's no different than in an unfair competition case, for example. We've cited to you the traffic school case from the Ninth Circuit. There you had a situation where you had a lot of competitors in the market for driving schools, and the allegation was that the defendant was falsely claiming an affiliation with the government. And as you say, you have to make an assumption that at least for some consumers, that kind of affiliation is going to be material to a purchasing decision. You don't need to show that absent the violation, there would be no harm of any kind to you. There would be no other incentives. Right. You need to show that there is some harm. Exactly. And what is the standard at this stage? At this stage, this is the pleading stage. That's right. So you assume all of the allegations... ...is plausibility, right? Exactly, exactly. And we've done more than that, because we've shown through unrebutted expert testimony, that we are competing in the same market, and that we get diplomatic business. These are elite businesses, elite restaurants and hotels that have diplomatic patrons. And we have shown what rarely can be shown in... We have shown. What do you mean by we have shown? Well, we have unrebutted expert testimony of... I thought we were at the pleading stage here, but now you're telling me about experts? Well, at the pleading stage, you don't have to use experts. You rely on the allegations, the well-pleaded allegations in the complaint. Your complaint recites the testimony of experts? No, Your Honor. We are permitted, in order to demonstrate Article 3 standing, to also introduce extrinsic evidence. We have done so through experts in the hotel and restaurant industry, and the government hasn't contested that expert testimony or introduced expert testimony of its own. So all I'm saying is that we've gone well beyond what's necessary at the pleading stage to show that we're competing in the same arena. We also have allegations... For competitive injury, you have to show, at least what the D.C. Circuit says, that you will almost surely lose business as a result of this, right? Do you agree with that standard, that that's the economic logic behind it? We have to show that we are at a competitive disadvantage where some of the consequential harms that flow from that competitive disadvantage will likely occur, that there's a substantial likelihood of that. The lost sales is one example, but it's not... It's not just the staying at the hotel. It's staying at the hotel in order to confer a benefit on the President. No, no. Why not? Because... I mean, that's the emolument problem. No, well, the emoluments clause doesn't require a quid pro quo or sienter. It's a broad prophylactic rule, and in our theory of the case, which you have to assume for purposes of the Article 3 analysis, is that payments from foreign and domestic governments to the President's businesses are violations of the emoluments clause. Just doing business is enough. Doing business with the people who are reached by the emolument clause, just doing business with the hotel is enough. Yes, if they are a foreign or government official. From your perspective. Yes, and... Now, you know there are two sides to that one, but that's your argument. But Ms. Finouf is gone from the case, right? That's right. Mr. Goode, who's got a number of restaurants in New York City, and then we've got Rock United. My understanding of Rock United is it's more of a training and resources entity for employees of the restaurant business. Am I right? It's not really... That's only part of what it does. How big a part of it? It is also a trade association with restaurant members, and the competitor injury doctrine started with Supreme Court cases involving trade associations that sued on behalf of their members. So this is very much in keeping with the origins of the doctrine. What's the purpose of Rock United? It's to have better working conditions on living wage for employees of these. Is that right? Well, that is a central mission of the organization. It's not the only mission. They are involved in raising standards in the restaurant industry. Those standards include wages, the sustainability of the food, and the fairness of competition in the industry. So this is very much germane to their mission, and the government hasn't contested that Rock has associational... Some of the members are restaurants, and they're saying, we will lose business. Exactly, exactly. So... That's a better ground, I think, than what you were saying a minute ago, that they just have a generalized interest because... They're not generalized injuries. These are... No, a generalized interest, I said. Oh, I see. An interest, just the fact that they have a broader interest in fair competition. Oh, yeah, just to be clear, Judge Walker, I only meant that because it's relevant to the question of associational standing. So you have associational standing... It's more like a trade association for restaurants. It's an organization that's trying to improve the working conditions of employees at restaurants and the hospitality industry. You have, I know you have members who are restaurants, and you have even diners that are members, but the principal mission is to improve those conditions for restaurant employees. It's not really a trade association promoting the other aspects of restaurants' success in the country, right? Getting more business, for example. No, it's not the National Restaurant Association, but it is a trade association. It does have restaurant members, and they do care about the fairness of competition, wages, and other aspects of the restaurant industry. And under this Court's associational standing cases, the association has standing to the extent that any of its members have standing. But unlike in the Supreme Court cases involving trade associations, we haven't just relied on a generalized interest. We've put forward declarations of specific member restaurants and expert declarations showing the level of granular competition between these restaurants and the defendant's businesses. We also, I want to point out, have allegations in the complaint, and this is unusual, where you have diplomats, foreign diplomats, saying that they will patronize the defendant's businesses because he is the president, that they will take business from the competing businesses and bring that business to the defendant's properties because he is the president. My concern here is, let's assume that you got rid of the emoluments problem, that all of a sudden there was a, you know, there was an accounting and every profit that was made from every patron who would be covered by the emoluments clause was reimbursed to the Treasury, hypothetically, something like that. Wouldn't people who want to curry favor with the president still use the hotels and still use the restaurants so that they could tell him they were doing it and they, or because they like the brand, or because they like the service, or because they wanted to confer financial enrichment on the family of the sons? So all those things would still, see, I, it's just the emoluments clause problem that is the only violation we're talking about here. It's certainly possible that some people would continue to patronize the businesses, but as Judge LaValle pointed out, that's not the test here. The question is whether there are some transactions that will, for this will be, where it will be material. The framers were right that the ability to line the pockets of an official matters in decisions that foreign governments make about whether to influence federal officials. There were some, there was an amicus brief that indicated that they would gain an advantage, and I guess that was cited to perhaps show that they would want to enrich the president. But by the same token, it does show, it cuts the other way, because it shows that even if the president wasn't being enriched, they'd still want to use the hotels. So they could take, get credit for having used the brand and still staying there and helping his kids or whatever else. So two quick responses, Judge Walker. The first is, remember what the standard is for addressability in this circuit from the Fulani case, which is a competitor standing case. We don't have to show that we need to be able to level the playing field entirely. Instead, we have to show that there's a likelihood that there will be a substantial ameliorative effect. So in order for this argument to make sense, the argument that the government and Judge Daniels have made, you have to assume that there are only two categories of officials. Officials who will never patronize the Trump properties, and officials who will patronize these properties regardless of the ability to line the pockets of a federal official. And that is an assumption that runs entirely counter to the design of the clause itself, which assumes that it matters to foreign officials whether they can put money into the pockets of an official. It's also the same assumption that underlies conflict of interest statutes and other conflict of interest rules where we draw the line at the official and we say, well, if they're the adult children or other family members, that might not look good, it might not be great, but we recognize that it matters whether you can engage in a transaction that is going to directly go to the bank account of the official. And so you would have to assume for this addressability argument to work that there is no official like that. Because if even some of the business would move hands, would change, and come to us because of that difference, then an order from a court would redress our injury. If there are no further . . . Can I ask you about the zone of interest for a second? And that is that a couple of cases that you cite are Bond and Chadha for the idea that an individual can take on a structural problem in the Constitution, a separation of powers or Tenth Amendment issue. But in both of those cases, there was a clear individual interest. In Bond, she was prosecuted under the statute. Chadha was going to be removed from the country. Do you need that kind of a direct injury to be able to make sure that who is ever bringing kind of a structural claim has a sufficient interest to prosecute it appropriately? Or do you just apply regular standing principles to that? Well, the zone of interest test only comes into play, Judge Roney, if you have already concluded that the three requirements of constitutional Article III standing are met, right? And then the question in these cases has been, at least historically, until Lexmark under the prudential standing analysis, is this person the kind of person that Congress or the drafters intended to benefit from this provision? And I think what these recent cases like Free Enterprise and Bond show is that at least with respect to structural constitutional provisions, I mean, you had a disgruntled accounting firm vindicating the structural separation of powers in Free Enterprise. In Bond, you had a criminal defendant vindicating the Tenth Amendment. That where someone is injured by a violation of a structural provision of the Constitution, the court has said that person can come forward and the courts can adjudicate that claim. Where is the intent that the Foreign Emoluments Clause was to do anything other than prevent corruption? That is, where was the intent? And by the way, we want to make sure that the competitors of the president also are on a level playing field. Where is that clear, like in Bond or in Chadha? Well, I think Bond and Chadha, just to be clear, they don't engage in any zone of interest analysis whatsoever. But assuming that there is some kind of zone of interest test that applies, what this court and the Supreme Court have said is that you've got to show that the interests you seek to assert are not so marginally related to the provision or inconsistent with the provision that it may as well be... Would your zone of interest be covered by the fact that this is an anti-corruption clause and because of corruption the market is distorted? Exactly. Competition is different than it would have been otherwise? Exactly, that's right. I mean, one of the facets we know about corruption, and the framers understood this, is that corruption corrupts what it touches and it skews markets. And in every place in the world where there is corruption, the ability to line the pockets of officials means that firms that have an affiliation with the government benefit to the disadvantage of firms that don't. And the framers understood that there's a legal historian's brief that talks about the historical underpinnings of the clause. There were examples under the Articles of Confederation government of people who mixed their private and public duties. And this is the sort of thing the framers were concerned about. So I think... Is it also pertinent that this is not a matter of choosing between which are the better situated persons to vindicate the intentions of the provision of law? But if these plaintiffs are not allowed to sue, no one is allowed to sue. There's no one who can enforce the clause if competitors cannot, because voters cannot. Right. And I do think that is part of the thinking that animates these recent cases from the Supreme Court that are not... What do you mean around Valley Forge on that basis then? I thought it was pretty clear there that the fact that no one could sue was not an impediment to finding no standing. Right. I think... So Valley Forge does recognize a zone of interest test in constitutional litigation in passing in dicta. I think if the court wants to squarely confront the question of whether a zone of interest test applies, you then have to look at what the effect of Lexmark is. I'm talking about the fact that there's no other plaintiffs. The fact that no plaintiffs can bring a suit is not fatal to an argument that there's lack of standing, right? Mike, my question had to do not with lack of standing, where it's clear that you don't need to have somebody who can sue. I was talking about applicability to zone of interest. Exactly. That's what I thought. I mean, if you assume that... All these questions assume that we've now shown Article III standing under the competitor standing doctrine. And the question is, do you tack on an additional prudential requirement? And I think after Lexmark, it's not clear that such a requirement even obtains anymore. It's certainly not part of prudential standing. And so I'm not sure that it's even in this appeal, in a 12b1 appeal. But assuming such a test applies, I think for the reasons the earlier colloquy brought out, I think we comfortably fall within any zone of interest of an anti-corruption provision because we are people most directly adversely affected by the corruption in the marketplace. And if there are no further questions, I'll reserve for rebuttal. Thank you. Thank you. The government? May it please the Court. I'd like to begin with the zone of interest issue because I think that's actually the most fundamental and most straightforward way of resolving this case. Judge Droney, as you noted, the interests that are served by the Emoluments Clause, and I think this is abundantly clear from the historical evidence, was a particular concern about corruption. It was the concern that the receipt of emoluments from foreign or domestic governments would have a corrupting influence on official action. There is just simply no support. They've cited nothing in the history. Their amicus briefs have cited nothing in the history that suggests that the concern was instead that the incidental effect of receiving an emolument is that some third party wouldn't have received that money. I think a hypothetical would make this very clear. Imagine if, for example, the Chinese government took the pandas that they've given to the National Zoo and just gave them to the president. That would be an emolument. There would be plenty of people with Article III injury from that. People wouldn't be able to go visit the pandas at the zoo. The zoo might lose revenue. Zookeepers might lose their job. But no one would think that those plaintiffs could sue to enforce the Emoluments Clause violation. Okay, but how about this hypothetical where the president, some president, receives a payment from a foreign nation? The president of a foreign nation. A secret payment that's discovered. How does the Emoluments Clause get enforced if he or she did not bring it to Congress to keep that payment? That's Judge LaValle's question. How does this... If it's just corruption and the president doesn't bring it to Congress for approval, how does it get enforced? Well, so two points, Your Honour. The first is, if the concern, as it is, is about corruption, if there is a credible allegation that that corruption led to adverse official action, it is possible, and I grant, it would be difficult to show traceability and redressability in these circumstances, but that someone adversely affected by the president's official action might be able to bring that to... Like who? So if, for example, a foreign government gave the president money and then the president then passed a law that benefited that foreign government and hurt someone else, that... Or issued an executive order. Right. That would be the person who would be within the zone of interest of the Emoluments Clause, whoever is harmed by the law that the president passes. Now, to be sure, there is going to be traceability and redressability problems with that, but I think that just underscores, as the Supreme Court has recognized in Richardson and as this Court has recognized in the Catholic Conference case, that some constitutional provisions, structural provisions and prophylactic provisions, are going to be of the type that they do not give rise to individual injuries that are redressable through court, and they are, in that sense, committed to the political branches. And the easiest way of making the point, Your Honor, is, again, take your exact hypothetical. Instead of them going to the hotels and restaurants, if they just gave a gift, plaintiffs wouldn't have standing. They conceitedly wouldn't have standing. I'm sorry. I want to go back to what you were arguing just a moment ago about giving the president pandas, because you said to us that if the Chinese government gave pandas to the president, there are lots of people who would have standing to sue, who would have economic injury in standing or some kind of injury in standing. Like, you're saying to us that the government would not oppose the suit if I brought suits saying, I wanted to visit pandas in the zoo. Nobody's talking about the zoo. We're talking about a gift of pandas to the president. And you say that I could go bring suit and say that I would have standing to bring suit because the gift was given to the president and not to the zoo in Washington or the zoo in San Diego or the zoo in New York. The Supreme Court has repeatedly recognized in cases like Luhan that aesthetic injury, the inability to visit certain animals, gives rise to suit, as long as you credibly allege that... We're talking about the zoo. All that happened was that China gave pandas to the president. Right. The zoo isn't involved in any way. Again, I said if the Chinese government had taken the pandas from the zoo and given it to the president, the people who would have gone to the zoo would have the exact injury, in fact, that was alleged in cases like Luhan and Summers, that they are unable to visit the panda. That is a recognized Article 3 injury, in fact. They won't dispute that that's a recognized Article 3 injury, in fact. And no one would think that that means that they can bring in the Monuments Clause suit. But then did you follow that up with my hypothetical, saying, well, if he gets a secret payment from the president of Japan for a million dollars, and it's found out, and he never did go to Congress to get approval for that, then who sues to say, hey, you were supposed to go to Congress to get approval of this. You can't keep the money. So, again, I agree, Your Honor, that it might be difficult for there to be a plaintiff who would have to sue, but that's true under their theory, too. Because, again, remember, on your hypothetical, where it's just a gift, who's going to have standing on their theory? There's not going to be a competitor. It doesn't matter. I mean, standing doesn't really have to do with the merits of the Monuments Clause problem. It has to do with whether there's a case or controversy. That's exactly right. And that's a separate question, totally separate. It doesn't matter what the merits are, one way or the other, right? That's exactly right, Your Honor. The Supreme Court in this court in the Catholic Conference case that there are going to be certain substantive provisions of the Constitution that are not going to give rise to judicial enforcement because they don't create injuries that are of the type that can be redressable in court. And your hypothetical shows that because they would not have standing on your hypothetical. It would be a gift. There would be no competitive injury. And I think that underscores another reason why they're wrong about the zone of interest. Well, let's, if, can we go back to Article 3 for a second? I just wonder about, you know, they've alleged that the fact of competition, the competition would be harmed. I don't think they have to, correct me if I'm wrong, but I don't think they have to go further and say how it was harmed or come up with specific numbers or anything else. It's logical that there would be losses and competition is harmed. That's the actual injury part. But then with traceability and regressability, I sense there's a sharp difference between your position and the plaintiff's here. Because they're saying that just doing business is enough to infer that some of that business is going to be done in order to confer benefits on the president. And that is, I guess your response is, well, that's entirely speculative and something more has to be shown than that. So there is a sharp difference. I think the key difference ties to Judge Droney's initial question, which is Article III generally requires an imminent, non-speculative injury. Competitor standing doctrine is not some massive end run around that requirement. It is not some JV standing doctrine. It is a recognition, as Judge Droney quoted from the D.C. Circuit, that in certain circumstances, economic logic allows you to presume that injury will occur because it is almost certain to occur given the way the economics of the markets work. Why is that a problem? Why is that a problem? The Trump restaurants and hotels are offering something that nobody else can offer. They're offering that by patronizing them, you are lining the pockets of the president. That is a powerful incentive to patronize those restaurants. Why is that speculative? It's normal logic to think that when you offer something as powerful as that that nobody else can offer, you're going to get an advantage. So it's speculative because there are three levels of speculation there, and I'd like to lay them out in turn. So the first level of speculation is the level of speculation that Judge Walker identified. First, you have to assume that the people who are patronizing the president's establishments are doing it because of his financial interest. Not all of them. They have to say at least some. At least some of the people who are going to the president's establishments are doing it because of his financial interest. The emoluments clause is only violated because of his financial interest. So, and Judge Walker took on my key point, if you look at their reply brief and you look at their amicus briefs, they emphasize that foreign governments will seek any advantage. They call it a foundational principle of diplomacy that they will seek any advantage. In that circumstance, it is highly speculative that the difference between him having a financial interest in it or instead it being still the Trump organization, the money goes to his children instead of to him, the idea that that's going to tip the scales for many, if any, foreign diplomats is highly speculative. That's the first level of speculation. The second level of speculation. Assume that there are some number of foreign diplomats for whom this is the tipping point. You still have to assume that they will then go to plaintiff's establishments. There are, to plaintiff's establishments rather than any of the countless other restaurants and hotels in New York and D.C. What is so unusual about this case, unlike most competitive standing cases, is you have a handful of plaintiffs suing a handful of defendants in a broadly diffuse market. They haven't identified a single example of lost business. They have in their complaint identified other hotels where business was lost, but they haven't identified a single example where they have lost business. The third, and I think this is probably the most unique aspect of this case, is, Judge LaValle, you suggested this is an obvious benefit. Who wouldn't want to patronize the president's establishments? It's an obvious benefit. I didn't say who wouldn't want to. So, all I would want to suggest is it's not so clear that it is an unalloyed benefit. The president, I don't think it's a surprise to say, is a very polarizing person. And just as there might be some people who might be interested in going to the president's establishments because he has a financial interest, so, too, there might be people who are disincentivized from going to the president's establishments. That's kind of your netting out argument in this, which is that it's okay to accept a foreign gift under the Emoluments Clause as long as the net of it all is zero. In other words, you can take the million dollars, but if it costs you a million dollars to kind of patronize Japan, it's okay. No, no, no, there's a very important difference between the merits and standing. The merits, if he takes the money from a foreign government and it's a prohibited emolument, that's a violation regardless of whether there's a net effect. Their standing is that they are losing money. For them to say that they have a financial injury, they have to show a net loss. And so, if it is the case that they are gaining business just as much as they are losing business... Are you arguing that somehow the normal competitive rules, the competitive standing cases are not applicable in this context? I'm suggesting that this is not the type of benefit where... It's not the normal kind, but still it's competition. It is competition, but again, the question is whether there's a type of benefit for which economic logic dictates that they will almost certainly incur injury. Part of what they rely on is the president's own statements virtually soliciting such business from foreign countries, making statements to the effect that, I love Saudi Arabia because they spend $40 million at Trump Tower. I love China because the largest bank in the world is a tenant of mine. Again, Your Honor... Those are statements that invite foreign governments, come and spend money. I will love you if you spend money in my establishment. I understand, Your Honor. And even if you assume that those foreign governments are only going there because of his financial interests, not because it's a Trump-branded property, and even if you assume that they would have otherwise gone to the plaintiff's establishment rather than any of the countless other establishments in New York, you still have to address the fact that there are other government officials who might not go to his property because he owns it. And this isn't speculative if you consider what happened in this very case in the district court. So you're saying the competition would be... You can't say that they'll necessarily lose competition. That's right. If you look at their allegations in district court, they heavily emphasized the Trump Soho Hotel and Restaurant. And they're not talking about it anymore on appeal. And the reason why is while this was in district court, the restaurant in the Trump Hotel closed and the owner of the Trump Hotel rebranded and severed its ties with the Trump management. And that was reportedly in part because the hotel was losing business because it was associated with the president. This is just not the sort of benefit where a competitor standing doctrine applies. And we've cited in our briefs two D.C. Circuit cases that have this feature, where the so-called benefit is not an unalloyed benefit, where it could just as well make the competitor lose or gain business. If you circle back again to Judge Dorney's initial point, it has to be the sort of competition where economic logic dictates they are almost certain to be injured because that is Article 3 requires a non-speculative imminent injury. Has the Supreme Court said that, though, it's got to be almost certain? They've used, I think, language that is very similar to that. The D.C. Circuit is the one that said it the most. But I think it follows from the fact that competitor standing can't be some sort of massive end run around the normal principles of Article 3 standing. It's a way of satisfying Article 3's requirements of a certainly imminent injury. You have to wait until there's injury that is expected to occur. That's right. And then the last thing I would say about the Article 3 point, Your Honour, is the Supreme Court has emphasised in cases like Clapper... So you're saying... So your argument, the argument you just made, would apply, supposing that the plaintiffs had charts and economic figures and actual testimony of foreign governments saying, we shifted from the plaintiffs' restaurants to Trump Hotel restaurants and Trump restaurants because of the fact that this money is going in, some of it into the president's pockets, and we want to encourage him like that. You would say, still no good, because there is the possibility that there are some people who don't like Trump and who don't go to those restaurants because of their association with him. So even if they had that, even if they had... They showed that their patronage from foreign countries had dipped by 50%, all shifting to Trump restaurants, no good, you would say, because there's the possibility that there are people out there who don't like Trump and don't go to those restaurants because they don't want to patronise at Trump. Their claim would be markedly less speculative if you assume that they had alleged either of the first two... I'm taking your argument. You say if they might have lost business as well from other sources, then it's no good. It's mere speculation. I think if they would allege... If they had come up with the evidence that you identified and if they could also allege that they weren't gaining benefit... You'll be able to say the same thing. No, I think, Your Honour, if you were right in your initial question that this is at the pleading stage, and so at the pleading stage, they only have to plead plausibly and non-speculatively. I think what's remarkable about this... Not plausible about their allegation? Well, I think what's remarkable about this case is this is probably the first competitor-standing case I've ever seen where they don't even allege competitive injury. If you look carefully at their declarations, their experts, all they say is that they compete. They don't say, we think the plaintiffs are going to lose business to the defendant. And I think the reason they stop short of that is because it is so unbelievably speculative whether that is the case. And the final point I was going to make about the Article 3 issue is Supreme Court in Clapper has emphasised that standing principles should be applied with particular rigour when you have a lawsuit that is challenging the constitutional actions of the executive branch. So however a competitor-standing doctrine might otherwise apply in ordinary commercial disputes or run-of-the-mill disputes involving statutory interpretation, in a case that's challenging the constitutional actions of the President of the United States, it is particularly imperative that this Court apply standing principles with the rigour that is required, that you not allow speculative injuries, that you ensure that these plaintiffs have a real dollars and cents stake in this case and that they are not trying to bring this Court to adjudicate an academic and ideological dispute rather than a commercial dispute. You've got your red lights on and I know this is sort of beside the point to some degree,  who are suing, bringing in a Monuments Clause action, correct? And their claim has nothing to do with competition. It has to do with the loss of power in the legislature. Is that correct? I believe that's essentially their injury, yes. Yeah, yeah, okay. So that's totally unrelated to this. This is more akin to the one that Judge Masseet handled down there, which was a competitive case. That's right, Your Honor. If I can make one final point on zone of interest, Your Honor, I think it's important to focus on the fact that the Supreme Court has repeatedly, when they have articulated the zone of interest doctrine, have always said that it includes constitutional guarantees and I think there's good reason for that. If you look at Lexmark, Lexmark emphasizes that zone of interest generally applies because we presume that causes of action don't extend to people who have injuries that are unrelated to the harms that are at issue. Take for example- Why isn't the answer to that what I suggested earlier, what we discussed with your adversary, the fact that this is an anti-corruption provision that can distort the markets? And period. That is not the type of harm that the Emoluments Clauses are intended to protect against. Interest, we're talking about interest. Right. Yeah, the type of interest that the Emoluments Clause were intended to protect against. I think the easiest way of explaining that is if you focus on the fact that this only covers foreign and domestic governments. It is not a prohibition that stops federal officials from enriching themselves, even if that hurts competitors in the market. Take this very case. There might be plenty of people, business people, who are staying at the Trump Hotel because they want to curry favor with the President. None of that is even substantively prohibited. The reason why is because the particular interest that the Emoluments Clause serve is a concern that foreign and domestic governments would corruptly influence the President or other federal officials' actions. It was a concern about corruption of his actions, not the fortuity that when they give him money, someone else doesn't get the money. Thank you. Thank you, Your Honor. Mr. Gupta, you have three minutes. Okay, just a few quick points. First, I want to set the context to make clear to the Court that you have two markets, New York and Washington, D.C., where you have tens of thousands of domestic and foreign government officials who are patronizing these businesses in numerous transactions, hundreds of restaurants in this association, and several hotels based in New York. And the assumption that the defendant's arguments rest on is that there are no officials for whom it will matter whether they can make a payment that will go to the President's bank account. And the problem with that position is that it's at war with the assumptions that underlie both the Competitor Standing Doctrine and the Emoluments Clauses. And it's, as Judge LaValle has pointed out, contradicted by statements from both the President and from foreign diplomats themselves who candidly admitted that it matters to them whether they have the ability to go to the President's hotel and patronize his business. And we have plausibly alleged, made these allegations in the complaint. There are a lot of different ways that could happen. Somebody might want to go there, regardless of the Emoluments Clause issue at all, assuming that there was a procedure that every penny that inured to the President's benefit was being paid back into the Treasury, just assuming that. The person might still want to go there because of the brand name and because he could go to the President and say, I had a wonderful time at the Trump Hotel last night. The hotel owned by your children or some other arrangement. By your children or whatever, yeah. And Judge Walker, I want to be clear. I'm not denying that that might occur, right? We don't have to persuade you that every official is going to take all of their business away from the Trump Hotel. Your position has to be non-speculative. That's right, that's right. And so what you have to, in order to credit the government's argument, you have to credit their speculation. As against all of the plausible allegations in our complaint at the pleading stage, you have to credit their speculation that there is not a single government official that will take their business from the Trump Hotel to our businesses. And remember what the status quo ante was, right? When the President took office, he took a stream of payments that, in our view, are all illegal payments that would have gone to us, would have gone to the competing businesses, and all went to the Trump Hotel. It would have gone to somebody. It would have gone to somebody. You're saying it had to be you. It would have gone to somebody. And the question is whether... That's another area. And the question is whether you can deny standing on the basis of their speculative assumption that there isn't a single official, contrary to the very framework of the Emoluments Clause, that will be influenced by the ability to line the official pockets of the official, right? And that is just, that is speculation on their side that is completely unsupported, and I think defies both common sense and the design of the clauses. And I think if you look at pages 37 through 41 of our opening brief, Judge Walker, we lay out the reasons why we think our causal chain is supported by the allegations in the complaint and the evidence we've put forward. And as against that, you've got just speculation. And you've got speculation... Aren't you going a little too far when you say that they have ensured that not a single one... I mean, if you were simply saying that there is one foreign government that would at least once go to trial, and that's all there is, that would be awfully thin, wouldn't it? It would be awfully thin. There is no de minimis exception to standing, so you have cases where there's a dollar or two for standing. But we have... You know, these are elite hotels and restaurants that are competing directly. And I see my time is running out, but just to give you a few examples, you know, these are... If you wanted to choose a two-star Michelin restaurant in midtown Manhattan, there are less than a handful. We have one. They have one. If you wanted to choose, you know, top-ranked hotels that are within a few points of each other in all the rankings, we have one such hotel in New York. They have one. If you wanted to choose... You know, there are, I think, just two two-star Michelin restaurants in Washington, D.C. We have one of those. It's within three blocks of the Trump International Hotel. These are the places that diplomats take their business, and it is not speculative to assume that if the president is not able to continue to violate the Emoluments Clause, that that business will come to us. So is there a... stage to the consideration of these questions, since this is at the initial stage? That's right. Would the... Would the government be able to renew its... Would Trump be able to renew his challenge at trial when there was fuller opportunity for evidence... Absolutely. ...to your standing to bring the suit? At summary judgment or at trial, as the case moves forward, the quantum of evidence that we have to put forward increases, but we're just at the pleading stage, and I think we have... So your position is that it is plausible that your members would lose some significant amount of business... Exactly. ...because of the pocket lining, even if there are others who would continue to go to his hotels for other reasons like enriching his children or just flattering him because of his brand, that it's nonetheless plausible that you lose some significant amount of business. Exactly. And so long as we have plausibly alleged that, we have discharged our burden to get in the courthouse door. Thank you. Thank you. Thank you both. We'll reserve decision.